Gregory F. Coleman (*pro hac vice*)
Adam A. Edwards (*pro hac vice*)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone:     (865) 247-0080
Facsimile:     (865) 533-0049
greg@gregcolemanlaw.com
adam@gregcolemanlaw.com

Mitchell M. Breit (admitted *pro hac vice*)
**SIMMONS HANLY CONROY**
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone:     (212) 784-6400
Facsimile:     (212) 213-5949
mbreit@simmonsfirm.com

*Attorneys for Plaintiff*
*Additional Attorneys on Signature Page*

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| THOMAS BAILEY, *on behalf of himself and all others similarly situated,*<br><br>PLAINTIFF,<br><br>v.<br><br>RITE AID CORPORATION,<br><br>DEFENDANT. | CASE NO.: 4:18-cv-06926-YGR<br><br>**PLAINTIFF'S REPLY MEMORANDUM AND POINTS OF AUTHORITY IN SUPPORT OF HIS MOTION FOR CLASS CERTIFICATION**<br><br>Date: April 6, 2021<br>Time: 2:00PM<br>Courtroom: 1, 4th Floor<br><br>Hon. Yvonne Gonzalez Rogers |

# **Table of Contents**

PRELMINARY STATEMENT ................................................. 1

ARGUMENT ............................................................ 2

   I.     COMMON ISSUES PREDOMINATE .............................. 2

      A.  Plaintiff presented evidence of class wide exposure. .......................... 2

      B.  Plaintiff presented evidence of materiality.................................... 3

          1.   Rite Aid had a duty to disclose. .................................. 3

          2.   Rite Aid's cited authorities do not defeat materiality. .............. 4

          3.   The Butler Report does not defeat materiality. ...................... 6

      C.  Plaintiff's Damages Model Fits His Theory of Liability....................... 9

  II.    PLAINTIFF  SATISFIES STANDING AND TYPICALITY.................................. 13

  III.  CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(B)(2) .............. 14

CONCLUSION ......................................................... 15

# <u>Table of Authorities</u>

**Cases**                                                                     **Page(s)**

*In re 5-Hour Energy Mktg. & Sales Prac. Litig.*, No. ML 13-2438 PSG (PLAx),
   2017 U.S. Dist. LEXIS 220969 (C.D. Cal. June 7, 2017) ........................................5

*Burgos v. Sunvalleytek Int'l, Inc.*, No. 18-cv-06910-HSG,
   2020 U.S. Dist. LEXIS 233611 (N.D. Cal. Dec. 11, 2020) ................................. 14

*Chapman v. Skype*, 162 Cal. App. 4th 217 (2013) ....................................................... 2

*In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919 (C.D. Cal. 2015) ........................... 9, 10

*In re ConAgra Foods, Inc.*, 302 F.R.D. 537 (C.D. Cal. 2014) ................................... 14

*In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326 (D.N.H. 2017) ....... 11, 12, 13

*Edwards v. Walmart*, No. CV 18-9655-GW(FFMx) (C.D. Cal. Aug. 4, 2020) ......................3, 6

*Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084 (N.D. Cal. 2018)............................. 5, 9, 10

*Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552 (N.D. Cal. 2020) ............................ 2, 6, 10

*Lambert v. Nutraceutical Corp.*, No. CV 13-05942-AB (Ex),
   2020 U.S. Dist. LEXIS 6391 (C.D. Cal. Jan. 8, 2020) ...................................... 6

*Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496 (2003) ................................... 2

*McGill v. Citibank, N.A.*, 2 Cal. 5th 945 (2017) .......................................................... 14

*McMorrow v. Mondelez Int'l, Inc.*, No. 17-cv-2327-BAS-JLB,
   2021 U.S. Dist. LEXIS 42885 (S.D. Cal. Mar. 8, 2021 ..................................... 10

*Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520 (N.D. Cal. 2018) ........................ 14

*Shanks v. Jarrow Formulas, Inc.*, No. CV 18-09437 PA (AFMx),
   2019 U.S. Dist. LEXIS 160199 (C.D. Cal. Aug. 27, 2019) ................................. 4

*Stearns v. Ticketmaster Corp.*, 655 F.3d 1013 (9th Cir. 2011) ................................... 9

*In re Volkswagen "Clean Diesel" Mktg., Sales, Pracs. & Prods. Liab. Litig.*,
   No. 3:17-cv-4372-CRB, 2020 U.S. Dist. LEXIS 201681 (N.D. Cal. Nov. 12, 2020) ........ 10

**Rules**

Fed R. Civ. P. 23 .................................................................................................. 1, 14

1

## **PRELMINARY STATEMENT**

2     Defendant Rite Aid Corporation's ("Rite Aid") challenges to class certification ignore the

3   facts, mischaracterize the law and eschew common sense. On predominance, Rite Aid's

4   arguments are belied by the facts (as set forth in Plaintiff's moving brief, conceded in Rite Aid's

5   opposition, and further detailed herein) and the law—particularly that the class claims at issue

6   are judged through the lens of an objective, reasonable consumer. It cannot be credibly disputed

7   that there was class wide exposure to a material label claim, as the challenged "rapid release"

8   representation appears on *every* Class Rapid Release product and they are uniformly priced at a

9   premium. Rite Aid further disingenuously asserts that "rapid release" is not material to a

10  consumer in search of pain relief. This assertion is made despite the fact that Rite Aid itself has

11  deemed the representation important enough to put on the front of every label. Further still, Rite

12  Aid's reliance on the Butler Report is misplaced. As explained by Steven Gaskin, the Butler

13  Report suffers from numerous, fatal flaws and biased reasoning which render its conclusions

14  questionable, if not entirely invalid.

15     Rite Aid's opposition to Plaintiff's proposed damages model—a conjoint survey—is

16  similarly unavailing. Rite Aid asserts that the conjoint survey is improperly designed, that it fails

17  to reflect "marketplace realities," and that it does not account for supply-side economic factors.

18  Plaintiff's experts demonstrate, however, that these arguments are flawed and incorrect on all

19  accounts. Further, Rite Aid's criticisms go to weight rather than admissibility and thus cannot

20  defeat class certification. Plaintiff's proposed conjoint survey, as designed, is an appropriate and

21  widely-accepted means of calculating classwide price premium damages.

22     On typicality, Rite Aid mischaracterizes and misrepresents Plaintiff's experiences, which

23  are typical of the Class. Plaintiff raises straightforward consumer deception claims predicated on

24  Rite Aid's intentional and pervasive use of the "rapid release" language on its acetaminophen

25  products. Language that is undeniably present to induce, and which did induce, consumers, such

26  as Plaintiff and Class Members, into believing that the Rapid Release Gelcaps worked faster than

27  Rite Aid's cheaper, non-rapid release acetaminophen products. Class certification, including

28  certification under Rule 23(b)(2), is appropriate.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<u>**ARGUMENT**</u>

**I.     COMMON ISSUES PREDOMINATE**

    **A.     Plaintiff presented evidence of class wide exposure.**

It is undisputed that the challenged "rapid release" label claim appears on every Class Rapid Release Gelcap package and label. As this Court already noted, the relevant inquiry is whether "a reasonable consumer could find the statement would be 'either actually misleading' or having the 'capacity, likelihood, or tendency to deceive or confuse the public." ECF No. 60, at 10. A "reasonable consumer" is one "who is neither the most vigilant and suspicious of advertising claims nor the most unwary and unsophisticated, but instead it is the ordinary consumer within the target population." *Chapman v. Skype*, 162 Cal. App. 4th 217, 226 (2013); *see also Lavie v. Proctor & Gamble Co.*, 105 Cal. App. 4th 496, 508 (2003).

Substantive discussion of the reasonable consumer standard is conspicuously absent from Rite Aid's argument. Instead, Rite Aid offers only a conclusory statement—unsupported by any factual references—that "significant questions" exist regarding whether putative class members saw or relied on the "rapid release" statement. Def. Br. at 15. But Rite Aid's "significant questions" do not exist. Instead, "[t]he relevant analysis under California law does not consider whether each class member saw and relied on each of the Challenged Statements and in what combination, but instead whether the Challenged Statements were used consistently through the Class Period, supporting an inference of classwide exposure, and whether the Challenged Statements would be material to a reasonable consumer." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 563-564 (N.D. Cal. 2020) (citing *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1095 (N.D. Cal. 2018)). The consistency of the challenged statements and Rite Aid's marketing practice in this instance are undisputed.[1]

Further, Rite Aid erroneously contends that "class wide reliance cannot be presumed given the lack of common proof showing uniform class member exposure to—and comparison

---

[1] Indeed, Rite Aid's opposition concedes that each variety of the Rite Aid rapid release product has the phrase "Rapid Release Gelcaps" on the product label, that Rite Aid uniformly prices the rapid release gelcaps at a higher margin, and that the Rite Aid products are placed in the same formation (e.g. Rite Aid next to Tylenol) to encourage consumer comparative. Def. Br. at 4.

of—*both* the Rite Aid RR Gelcaps product label and the Rite Aid acetaminophen tablets or caplets products label." Def. Br. at 14 (emphasis in original). As noted above, it is undisputed that the challenged statement appears on every Class Rapid Release Gelcap product, and Plaintiff's moving brief demonstrates that, by Rite Aid's own design, the rapid release product is commonly and intentionally placed in close proximity to its non-rapid release counterparts and priced at a premium. Moreover, Rite Aid's argument in this instance has already been rejected by another court:

> The Court disagrees with Walmart, and finds that class-wide exposure can be presumed here. As Plaintiffs note, regular-release acetaminophen products are "one of the most ubiquitous over the counter medications and [are] stocked immediately adjacent to the rapid-release products." The Court finds it implausible that the proposed class members would have had materially different exposures to the Equate regular-release products. Furthermore, the Court does not find Walmart's distinction between representations that are allegedly misleading on their face versus those that are misleading only when placed in context with other statements as sharp as it argues. It is true, as Walmart notes, that the Court found that "Plaintiffs fail[ed] to reference or allege that there is actual language on the Defendant's rapid release gelcap packaging . . . which actually promises faster or cheaper relief." But there the Court was discussing the lack of any comparative statements in the context of dismissing the breach of express and implied warranty claims. It did not require Plaintiffs to plead that the proposed class members physically perceived the Equate regular-release products as part of their FAL, UCL, or CLRA claims.

*Edwards v. Walmart*, No. CV 18-9655-GW(FFMx), ECF No. 121 (C.D. Cal. Aug. 4, 2020) (adopted as final March 4, 2021) (internal citations omitted).

### B. Plaintiff presented evidence of materiality.

#### 1. Rite Aid had a duty to disclose.

Contrary to Rite Aid's contention (Def. Br. at 16 n.11), Plaintiff has not waived any omissions claim and Rite Aid was under a duty to disclose. As this Court already found, "[i]n California, in transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; (3) the defendant actively conceals discovery from the plaintiff." ECF No. 60, at 11

(punctuation and citation omitted). In his opening brief, Plaintiff set forth in detail the facts contained in the record that demonstrate Rite Aid's violation of all three of these standards by creating and placing statements on the label and packaging that are likely to deceive reasonable consumers. Pl. Br. at 6-9.

**2. Rite Aid's cited authorities do not defeat materiality.**

The cases Rite Aid relies on offer no true support. For example, despite claiming it possesses "striking similarity to this [case]," *Shanks v. Jarrow Formulas, Inc*. is patently inapposite. According to Rite Aid, in *Shanks* "plaintiff alleged the labels on the defendant's Coconut Oil products were misleading because, contrary to the message conveyed by the labeling, the products were not healthy." Def. Br. at 17 (citing *Shanks*, No. CV 18-09437 PA (AFMx), 2019 U.S. Dist. LEXIS 160199 (C.D. Cal. Aug. 27, 2019)). But contrary to Rite Aid's assertion, the challenged statements in *Shanks* made no reference to whether the product was "healthy." Instead, the statements at issue were purely scientific in nature. This distinction is explained by the *Shanks* court:

> This Court agrees that on its face, a label that says "Helps Maintain a Healthy Heart" could be considered material and likely to lead a significant portion of the public to believe that the product does in fact help maintain a healthy heart. The same cannot be said for the challenged statements here. The Court is not convinced that the label statements — 'Source of Medium Chain Triglycerides'; 'No Trans Fatty Acids'; 'No Hydrogenation'; and 'Coconut oil is a source of medium chain triglycerides (MCTs), such as lauric acid (C-12) and caprylic acid (C-8)' — would lead a significant portion of the public to believe that Defendant's coconut oil is a healthier fat than other alternatives. Unlike the phrase 'Helps Maintain a Healthy Heart,' these scientific terms *are unlikely to be understood by an average consumer*, let alone lead a consumer to believe that coconut oil is healthy. An average consumer could easily conclude that the challenged label is disclosing unhealthy attributes of coconut oil.

*Id*. at *14-15 (emphasis added). Thus, rather than defeat class certification, *Shanks* in fact supports Plaintiff's position. Like the phrase "Helps Maintain a Healthy Heart," the phrase "rapid release" is one that the evidence in the record shows would be considered material and likely to lead reasonable consumers to believe that the product provides an additional benefit, *i.e.* release and faster relief. *See, e.g.*, Pl. Br. at 2-4; Declaration of Mitchell M. Breit in support of Plaintiff's Reply on Motion for Class Certification ("Breit Reply Decl."), Exhibit 20 ("Bailey Dep.") at

56:2-5 (testifying that the rapid release advertising is "something that brings a person's attention and gives them the idea that it should work faster than…a capsule that does not say rapid release"). Indeed, this is the very conclusion that Rite Aid intended to convey to consumers. Pl. Br. at 4-8.

Rite Aid's reliance on *In re 5-Hour Energy Mktg. & Sales Practices Litig.* is equally unavailing. There, the challenged terms were wholly subjective and not subject to scientific testing. *See In re 5-Hour Energy Mktg. & Sales Prac. Litig.,* No. ML 13-2438 PSG (PLAx), 2017 U.S. Dist. LEXIS 220969, at *2-3  (C.D. Cal. June 7, 2017) ("[Plaintiffs] allege that Defendants deceptively and misleadingly marketed 5HE as "five hour energy" or providing "hours of energy" when 5HE provides only a few minutes of energy at most."). Here, the "rapid release" claim is not purely subjective; it is amenable to scientific testing which shows it is false. Pl. Br. at 8. Critically, the holding in *In re 5-Hour Energy* regarding what evidence is required at class certification is obsolete. Specifically, *In re 5-Hour Energy* unequivocally stated that "[a]bsent a consumer survey or other market research to indicate how consumers reacted…, and how they valued these statements compared to other attributes of the product and the energy supplement market generally, Plaintiffs have not offered sufficient evidence of materiality across the class." *Id*. at *20-21. This statement has since been directly contradicted by decisions from the Northern and Central District Courts of California. For example, in a 2018 decision from the Northern District, the court rejected defendant's challenge to the sufficiency of plaintiff's evidence of materiality:

> To the extent [defendant] argues that [p]laintiff's expert testimony is weak or that Plaintiff lacks consumer survey evidence, that argument is without merit. *California courts have explicitly reject[ed] [the] view that a plaintiff must produce extrinsic evidence such as expert testimony or consumer surveys in order to prevail on a claim that the public is likely to be misled by a representation under the FAL, CLRA, or UCL.*

*Hadley v. Kellogg Sales Co*., 324 F. Supp. 3d at 1115 (emphasis added). Significantly, the *Hadley* court rejected the same argument that Rite Aid raises in this instance: that Plaintiff's expert Bruce Silverman's opinions on materiality lack merit because Silverman did not survey or interview consumers to determine if the challenged statement was material. *Compare id.* (citing Opp. at

32) *with* Def. Br. at 7-8; *see also Krommenhock*, 334 F.R.D. at 555 (rejecting need for consumer surveys and holding that testimony from marketing expert Bruce G. Silverman, as well as the damages models developed by Gaskin and Weir, support that the challenged statements could have been material to the reasonable consumer); *Lambert v. Nutraceutical Corp.*, No. CV 13-05942-AB (Ex), 2020 U.S. Dist. LEXIS 6391, at *25 (C.D. Cal. Jan. 8, 2020) (noting that "the absence of a consumer survey does not alone defeat materiality").[2]

### 3. The Butler Report does not defeat materiality.

As an initial matter, Plaintiff's expert Bruce Silverman has demonstrated the materiality of the label claim. Pl. Br. at 2-3, 16-19; *see generally* ECF No. 92-6, Silverman Decl. Further, and contrary to Rite Aid's contention, the Butler Report does not refute materiality. It cannot do so because it suffers from fatal deficiencies that demonstrate bias and render its results questionable. As explained in detail by Steven Gaskin, the Butler Report fails to address the relevant questions at issue in the case, fails to follow-up on open-ended data to eliminate ambiguity, and the data as presented is based on biased miscalculations that intentionally skew the results downward. Breit Reply Decl., Exhibit 21 ("Gaskin Reply"), ¶¶ 30-70. For example, the Butler Report erroneously discounts *any* answer related to "fast," "quick," "rapid," or the like, maintaining that only answers of "fast*er*" or quick*er*" should be considered in ultimate percentages. *Id.*, ¶¶ 31, 45. Compounding the error, Butler fails to follow-up on her open-ended questions and arbitrarily restricts follow-up to certain close-ended questions, thereby eliminating the vast majority of respondents. *Id.*, ¶ 47.[3] The net result is that Butler is able to artificially

---

[2] Plaintiff notes that in *Edwards, et al. v. Walmart, Inc.*, the court denied class certification *without prejudice*, finding that the *Edwards* plaintiffs had failed to rebut Walmart's consumer survey regarding the purported insignificance of the "rapid release" label. 2:18-cv-09655, ECF No. 121 at 9. While Plaintiff maintains that the *Edwards* ruling is inconsistent with the prevailing law (*see* supra), the *Edwards* ruling is distinguishable on the facts. In *Edwards*, the plaintiffs did not present expert evidence on materiality, whereas here Plaintiff has proffered the expert opinion of Bruce Silverman, and has further detailed why the consumer survey used by Rite Aid is inaccurate and biased. *See* Sec. B.3.

[3] Proper methodology teaches that asking open-ended questions, without follow-up, is inappropriate because open-ended questions often result in answers that are too vague and global. Gaskin Reply ¶¶ 38-42. Thus, follow-up or request for elaboration is a crucial part of research to ascertain the customers' wants or needs. *Id.* Butler's failure to engage in proper follow-up is a

1  manipulate the results to present much lower percentages in order to support Rite Aid's position.

2  *Id*.

3      Rite Aid asserts that the Butler Report found that when consumers were given the

4  opportunity to choose among twenty-three different reasons regarding why they purchased the

5  Rite Aid Rapid Release product, the most frequent answers given were price, fit my symptoms,

6  or easy to swallow. Def. Br. at 10 (citing Butler Report ¶ 58). But as Gaskin points out, the close-

7  ended question *omits* from the proffered list of reasons *any option* for "rapid release," or even

8  speed and efficacy. Gaskin Reply ¶¶ 43-44. Thus, the close-ended list of "reasons" was

9  intentionally engineered to shy away from the relevant issue, and Butler could provide no

10 justification for her omission. *Id.*.[4] Further, skewing the results is the fact that Butler restricted

11 follow-up to only certain responses; only four of the twenty-three listed reasons qualified for

12 follow-up. *Id.*, ¶¶ 43, 47. Butler therefore determined, with no supporting basis, that certain

13 responses, like "prefer Gelcaps" or "other (please specify)," have no possible relation to fast or

14 rapid release; these respondents were asked no follow-up questions as Butler presumed that their

15 answers negated any preference for speed of efficacy. *Id.* By restricting the set of answers

16 regarded as valid (i.e. qualified for follow-up), Butler makes it possible to skew her percentages

17 downward. *Id.*

18     For example, Rite Aid asserts that "[*l*]*ess than 4.7%* of past purchasers (11 out of 236

19 respondents) said they purchased Rite Aid RR Gelcaps because of 'the way the product works'

20 *and* indicated that this meant the product worked 'faster' and 'quicker.'" Def. Br. at 10 (citing

21 Butler Report, ¶¶ 58, 60) (emphasis in brief). Gaskin debunks this calculation by first noting that

22 the Butler Survey demonstrates that 53 out of 93 respondents indicated that they purchased the

---

23
24 critical error, as open-ended questions account for almost all of the Butler survey questions. *Id.*,
   ¶ 42. Moreover, by failing to engage in appropriate follow-up, Butler is able to discount the vast
25 majority of respondents as those who had no stated preference for speed of efficacy. *E.g.*, *id.*, ¶
   54. Stated differently, she improperly presumes that any vague or global answer necessarily
26 indicates that the respondent had no preference for speed of efficacy.

27 [4] Gaskin notes that there is in fact no information, reasoning, or supporting methodology as to
   how the list of reasons was generated or why the central claim at issue was omitted. Gaskin Reply
28 ¶ 44.

product because of "the way it works" and, on follow-up, said that this had to do with "the product's speed of efficacy." Gaskin Reply ¶ 54. This supports materiality of the label claim, as it indicates that 57% of respondents *who qualified for the follow-up question* indicated a speed preference.[5] *Id.* Next, Butler asserts that 43 of the above 53 "simply indicated that [the] product is 'fast' or works 'quickly.'" Setting aside the fact that Butler improperly discounts these responses (*see* Gaskin Reply ¶ 31), she reaches her "less than 4.7%" calculation (11 out of 236 respondents) by switching denominators from the 53 respondents who qualified for follow to all 236 respondents. *Id.* This is incorrect. The denominator that provides a consistent comparison would be the 53 respondents qualified for follow up, thus rendering the actual figure 10 out of 53, meaning 19% of past purchasers considered the product "faster" or "quicker."[6] *Id.* Finally, Gaskin found that 36 out of 112 respondents (32%) gave a vague or global answer, which were improperly presumed by Butler to be irrelevant, thereby further lowering Butler's calculated percentages. *Id.*

Similarly flawed is Rite Aid's assertion that "of the 76 respondents (32.2%) who chose 'information on label' as a reason for buying the product, only nine (or 3.8% of all past purchasers) said anything about speed of efficacy." Def. Br. at 10 (citing Butler Report ¶ 61). Again, this calculation is skewed as Butler improperly uses the 236-denominator (9 out of 236 respondents), rather than the more consistent denominator of 76 respondents who qualified for follow up (9 out of 76 respondents), meaning 12% gave a reason related to speed of efficacy. Gaskin Reply ¶ 55.[7] Likewise, Rite Aid's percentage of "only 22 respondents (less than 10%) thought the Rite Aid RR Gelcap worked 'faster' or 'quicker'" (Def. Br. at 10 (citing Butler Report ¶ 64)), ignores the fact that "29.7% of past purchasers mentioned something relating to speed of

---

[5] As noted above, Butler's arbitrary decision to restrict follow-up to limited responses (4 out of 23 reasons) is overly restrictive, as it improperly eliminates many respondents, thus ensuring that the pool of "valid" responses is small and calculated percentages lowered.

[6] It appears that "11" was a miscalculation, as 53 less 43 is 10. Gaskin Reply ¶ 54. However, if 11 is the correct figure, that percentage grows from 19% to 21%. *Id.*

[7] This calculation is, again, further skewed by the fact that Butler ignored roughly two-thirds of the respondents who gave a vague or global answer to the question. Gaskin Reply ¶ 55.

1    efficacy, and 77% of respondents gave vague or global answers which cannot be properly

2    analyzed." Gaskin Reply ¶ 57.

3         The same faulty reasoning and miscalculations pervade Butler's conclusions regarding

4    survey respondents understanding of "rapid release." Gaskin Reply ¶¶ 65-69. Accounting for

5    Butler's errors, Gaskin has determined that, even based on the skewed data presented,  23.9% of

6    respondents indicated that "rapid release" related to speed of efficacy. Gaskin Reply ¶ 65. Gaskin

7    further determined that the percentage of respondents giving an answer related to speed of

8    efficacy equated to 95% for the Test Group and 88% for the Control Group, thus indicating a

9    general agreement among all respondents who were asked the question that "rapid release" refers

10   to speed of efficacy. Gaskin Reply ¶ 66.

11        In sum, Gaskin identifies myriad flaws, inconsistencies, and ambiguities created by the

12   design of the Butler Report that call into question the report's utility. And, importantly, for class

13   certification purposes, there is nothing in the Butler Report that compels the Court to deny

14   certification. Indeed, even looking at the skewed data, of the respondents given the opportunity

15   to elaborate 57% indicated a speed preference, and 23.9% indicated that "rapid release" related

16   to speed of efficacy. Gaskin Reply ¶¶ 54, 65. To be material, a claim need not be the motivating

17   factor or driver for the purchase, but only something to which "a reasonable man would attach

18   importance . . . in determining his choice of action[.]" *Stearns v. Ticketmaster Corp.*, 655 F.3d

19   1013, 1032 (9th Cir. 2011). Thus, a representation can be material even when only a small

20   percentage of consumers in a survey viewed the challenged term in the same misleading way as

21   the plaintiffs. *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1019 (C.D. Cal. 2015), *aff'd sub*

22   *nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno*

23   *v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017); *see also Hadley*, 324 F.Supp.3d at

24   1116 (noting that a plaintiff need not prove that the challenged terms were the "sole or even the

25   predominant or decisive factor influencing" the class members' decision to purchase).

26        **C.    Plaintiff's Damages Model Fits His Theory of Liability.**

27        Rite Aid also asserts that Plaintiff's experts fail to account for supply and pricing factors

28   in the proposed conjoint analysis. Def. Br. at 21-23. In actuality, Plaintiff's experts accounted for

supply-side economic factors by using the product's actual pricing and by relying on actual sales data. Weir Decl., ¶¶ 30, 35, 39-40; Gaskin Decl., ¶ 26; Breit Reply Decl., Exhibit 22 ("Weir Reply"), ¶¶ 38-47. By using the market prices that Plaintiff and the class members actually paid for the products and the actual quantity of the products sold by Rite Aid, Plaintiff's damages experts have accounted for *both* supply and demand conditions in the proposed damages model. Weir Reply ¶¶ 40-47; *e.g.*, *Krommenhock*, 334 F.R.D. at 576 (granting certification based upon Gaskin's and Weir's conjoint analysis for measuring price premium); *Hadley*, 324 F. Supp. 3d at 1106 (finding that "Gaskin's proposed conjoint analysis adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay" because it utilizes actual pricing and sales data) (citing cases); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1026-28 (C.D. Cal. 2015). ████████████████████████████████████████████████████████

████████████████████████████████████████████████████. Weir Reply ¶ 41; Breit Reply Decl., Exhibit 23 ("Plancich Dep.") at 55:18-23 ██████████████████

██████████████ (emphasis added).

Nevertheless, Rite Aid erroneously argues that Gaskin's survey examines only a consumer's "willingness to pay." Def. Br. at 22 (citing *In re Volkswagen "Clean Diesel" Mktg., Sales, Pracs. & Prods. Liab. Litig.*, No. 3:17-cv-4372-CRB, 2020 U.S. Dist. LEXIS 201681, at *20-21 (N.D. Cal. Nov. 12, 2020)). While a small number of courts were convinced to adopt this reasoning, they represent a marginal group compared to the majority of decisions holding that conjoint analysis is widely accepted as a reliable economic tool for isolating price premia. *E.g.*, *Hadley*, 324 F. Supp. 3d at 1110. In fact, this Court has held on numerous occasions—and even when considering some, if not most, of the cases Rite Aid cites—that a conjoint analysis like the one proposed by Plaintiff has adequately accounted for supply-side considerations. *E.g.*, *Krommenhock*, 334 F.R.D. at 576; *Hadley*, 324 F. Supp. 3d at 1106. And another court applying California law rejected these same arguments just this month. *McMorrow v. Mondelez Int'l, Inc.*, No. 17-cv-2327-BAS-JLB, 2021 U.S. Dist. LEXIS 42885, at *39-43 (S.D. Cal. Mar. 8, 2021).[8]

---

[8] The *McMorrow* court expressly rejected the applicability of two cases on which Rite Aid heavily relies. The court noted that *General Motors* applied only to product defect cases and expressly

1    The *In re Dial* court perhaps explained best how the conjoint analysis operates. There,

2 the defendant raised the same arguments Rite Aid raises here: namely, that Plaintiff's proposed

3 conjoint analysis measures only the consumers' "willingness to pay" (that is, demand) and fails

4 to account for supply-side factors. *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D.

5 326, 333-34 (D.N.H. 2017). The court rejected this, however, explaining that the defendant's

6 "criticism of [the conjoint analysis] model perhaps rests on a misunderstanding of what it

7 purports to do." *Id.* at 335.

8
> The model does not, as Dial contends, seek to determine an . . . expression of
9 > consumer 'willingness to pay' for the [] product without the claimed feature,
> unconnected to supply side market forces. Rather, [the] model purports to calculate
10 > the 'Marginal Consumer's Willingness to Pay' for that product in the actual market
> in which the products with the allegedly false claims *were sold*.
11

12 *Id.* (emphasis added). Plaintiff's proposed conjoint analysis here operates in the same manner.

13 As Weir explains, this does not suggest that market price cannot be calculated. Quite the

14 contrary, as designed the conjoint analysis *ensures* that market price is calculated. Weir Reply

15 ¶¶ 34-37. ███████████████████████████████████████████████████

16 ██████████████████████████ Plancich Dep. 52:8-53:9. ████████████████████

17 ████████████████████████████████████████████████████████████████████

18 ███████████████████████████ *Id.* Rite Aid's criticism of Gaskin and Weir's conjoint analysis is

19 undermined entirely by its own economic expert.

20    The fact that Plaintiff's experts rely on *actual* market pricing data ensures that these

21 supply-side considerations (even though irrelevant to consumer decision-making) are accounted

22
———————————————

23 found that "conjoin analysis is applicable 'in a classic mislabeling case,' such as the present
action." *Id.* at *14 (quoting *In re Gen. Motors, LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212,
24 238-39 (S.D.N.Y. 2019)). Moreover, in *Zakaria*, the lingering issue with the plaintiffs' conjoint
analysis was the reliance on "hypothetical prices" that failed to "correlate to actual market prices
25 for the product at issue." *Id.* (quoting *Zakaria v. Gerber Prods. Co.*, No. LACV1500200, 2017
U.S. Dist. LEXIS 221124, at *28 (C.D. Cal. Aug. 9, 2017)). The *McMorrow* court noted that
26 where a conjoint analysis relies on actual product pricing and the quantities of products actually
sold—as Gaskin and Weir do here—this issue from *Zakaria* cannot apply. *Id.* Upon closer
27 examination, *none* of the cases on which Rite Aid relies actually undermine Plaintiff's proposed
damages model.
28

for in the classwide damages calculations. Weir Reply ¶ 43 ("There appears to be no dispute that the prices in the Gaskin survey are reflective of the prices paid by Class members, and therefore incorporate the relevant impact of Rite Aid's cost structure (as well as other supply factors)."). Rite Aid does not advocate for Gaskin and Weir to account for the supply-side factors prior to the consumers' purchases in the real-world—which have *already* occurred, and for which they have already accounted. *Id.* Instead, Rite Aid advocates that they should have considered manufacturer considerations in the "but-for" world where Rite Aid must remove the deceptive "Rapid Release" term. It demands that when calculating damages, Plaintiff must assume an alternate reality wherein Rite Aid does *not* engage in deceptive conduct before its motivations in setting price (the supply-side factors) can be considered. *See id.* ¶¶ 53-58; *see also id.* ¶¶ 59-63.

As Weir explains, accounting for "willingness to sell" makes no logical sense from an economic perspective. *Id.* ¶¶ 53-54. But willingness to sell is a useless metric in this case, because

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Plancich Dep. 55:24-56:13.[9] ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████ *Id.*

at 55:14-58:3. There is indeed no logical basis to argue that damages may *only* be calculated after taking into account a non-existent reality where Rite Aid actually was truthful in its labelling. For the Court to adopt such a "willingness to sell" rule for damages calculations would "allow[] any Defendant to simply postulate its way out of owing any damages." *Id.* ¶ 54. This flawed logic grants an inappropriate safe harbor to manufacturers. Moreover, Rite Aid's implication that its

---

[9] Rite Aid also asserts that the "rapid release" statement on the product is immaterial to a reasonable consumer. However, if removing that claim from the product would affect its willingness to sell, then the "rapid release" term *must be material*. If the "rapid release" term is truly unimportant to consumers, as Rite Aid asserts, then this Court should not presume—again, as Rite Aid would demand—that it would have any effect on its consideration to sell the product (that is, supply-side considerations). ████████████████████████████████████ Plancich Dep. 55:24-56:13. Quite simply, Rite Aid cannot have it both ways.

1  willingness to sell would somehow change in the make-believe world where it removed the

2  deceptive rapid release language from the label of these products is wholly inconsistent with its

3  position that the challenged terms are immaterial to consumers. The Court should reject this out

4  of hand.

5  **II.   PLAINTIFF  SATISFIES STANDING AND TYPICALITY**

6          Rite Aid challenges typicality and raises a standing argument on the basis that "Plaintiff's

7  experience does not match [his] allegations." Def. Br. at 24. But this challenge is based on cherry-

8  picked testimony that mischaracterizes Plaintiff's point of purchase experience. While Rite Aid

9  argues that Plaintiff "did not look at products on different shelves" (Def. Br. at 24 (citing Bailey

10  Dep. at 51:10-12)), the full context of Plaintiff's testimony reveals that he did not look at different

11  shelves because "[m]ost of the pain relief products [Rite Aid] had were [o]n one general shelf."

12  Bailey Dep. at 51:10-12. In the context of his purchase of the Rite Aid Rapid Release Gelcaps,

13  Plaintiff went to Rite Aid in search of a pain reliever. *Id.* at 44:1-5. He recalled going to the pain

14  relief aisle, where the pain relief products were organized together, reviewing what pain relievers

15  Rite Aid had, and purchasing the one that he thought would do the job most appropriately. *Id.* at

16  48:12-50:22; *see also id.* at 28:12-16, 36:9-13, 45:7-16. In doing so, Plaintiff reviewed "several

17  [acetaminophen products]" and ultimately purchased the Rite Aid Rapid Release product based

18  on the label advertising and product pricing. *Id.* at 45: 7-11; *see also id.* at 60:25-62:3 (noting

19  that he goes by label advertising); *Id.* at 64:23-66:94 (noting that he was able to identify the price

20  differential because the prices were displayed below each product). The rapid release advertising

21  "caught [Plaintiff's eye]" (*Id.* at 60:25-61:3), because it led Plaintiff to believe that the product

22  would "act faster than the other kinds of pain relief capsules." *Id.* at 55:9-12. Plaintiff "was

23  willing to pay a high price for the rapid release" (*Id.* at 67:17-18), but would not have purchased

24  the more expensive product had he known that it did not work as advertised. *Id.* at 66:9-14; *see*

25  *also* 69:20-22 ("if neither one said 'rapid release,' I would have probably bought the cheaper

26  one"). Plaintiff's experience is therefore typical of all class members: he purchased a product

27  labeled as "rapid release," believing that the product would provide faster relief than the cheaper,

28  non-rapid release products when in fact it did not.

Rite Aid further challenges typicality on the basis that Plaintiff's "gripe[] is not that the product did not release quickly enough" but instead that "the product did not relieve the pain in his hand at all, no matter the time." Def. Br. at 24. But Rite Aid conflates Plaintiff's experiences with the product *after purchase* with his considerations *at the time of purchase*. Here, Plaintiff's claim is measured *at the point of sale*. A purchaser's post-purchase experience with the product are irrelevant because the harm was suffered the moment the consumer, misled by the product label, purchased the product. As Rite Aid admits, when Plaintiff saw the product "and the words 'rapid release' on the label and/or hangtag, he stopped looking and purchased that product." Def. Br. at 24. For the same reasons, Rite Aid's arguments related to Plaintiff's subsequent purchase of an immediate-release product is without merit.

Plaintiff's experience is typical of the class and his testimony demonstrates his standing to pursue these claims as he undisputedly relied on the misleading "rapid release" claim. *See, e.g.* Bailey Dep. at 36:2-23; 44:10-12; 45:7-16; 46:10-11; 50:19-22; 54:18; 55:9-12; 56:2-5.

### III.   CLASS CERTIFICATION IS APPROPRIATE UNDER RULE 23(B)(2)

Despite Rite Aid's claim to the contrary, the injunctive relief appropriately sought in this case justifies certification under Rule 23(b)(2). "Ninth Circuit precedent indicates that the court can separately certify an injunctive relief class and if appropriate, also certify a Rule 23(b)(3) damages class." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 573 (C.D. Cal. 2014). Injunctive relief is available under both the CLRA, UCL, and FAL. *E.g., McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955 (2017). Here, the gravamen of the action is the placement of the challenged terms on the product packaging. Injunctive relief prohibiting this continuing deception is appropriate in a mislabeling case. *Burgos v. Sunvalleytek Int'l, Inc.*, No. 18-cv-06910-HSG, 2020 U.S. Dist. LEXIS 233611, at *14 (N.D. Cal. Dec. 11, 2020) (granting certification under Rule 23(b)(2) and finding that injunction would provide relief to each class member to redress uniform mislabeling claim); *Schneider v. Chipotle Mexican Grill, Inc.*, 328 F.R.D. 520, 539 (N.D. Cal. 2018) ("Based on the alleged mislabeling, the Court finds that it would, and grants certification of all four classes under Rule 23(b)(2).").

**CONCLUSION**

For the reasons stated above, and those set forth in Plaintiff's moving brief, Plaintiff respectfully requests that the Court grant his Motion for Class Certification.

RESPECTFULLY SUBMITTED AND DATED this 16th DAY OF MARCH, 2021.

**GREG COLEMAN LAW PC**

By:  *s/Gregory F. Coleman*
Gregory F. Coleman (*pro hac vice*)
Email: greg@gregcolemanlaw.com
Mark E. Silvey (*pro hac vice*)
Email: mark@gregcolemanlaw.com
Adam A. Edwards (*pro hac vice*)
Email: adam@gregcolemanlaw.com
800 South Gay Street, Suite 1100
Knoxville, Tennessee 7929
Telephone: (865) 247-0080
Facsimile:  (865) 522-0049

Mitchell M. Breit (*pro hac vice*)
Email: mbreit@simmonsfirm.com
An V. Truong (*pro hac vice*)
Email: atruong@simmonsfirm.com
112 Madison Avenue
New York, New York 10016-7416
Telephone: (212) 784-6400
Facsimile: (212) 213-5949

Eric S. Johnson (*pro hac vice*)
Email: ejohnson@simmonsfirm.com
SIMMONS HANLY CONROY
One Court Street
Alton, Illinois 62002
Telephone: (618) 259-2222
Facsimile: (618) 259-2251

Jason O. Barnes (*pro hac vice*)
Email: jaybarnes@simmonsfirm.com
SIMMONS HANLY CONROY
231 South Bemiston Avenue, Suite 525
St. Louis, Missouri 63105
Telephone: (314) 259-6700
Facsimile: (618) 259-2251

*Attorneys for Plaintiff*

1

## **<u>CERTIFICATE OF SERVICE</u>**

2

  I hereby certify that on March 16, 2021, I electronically filed the foregoing document

3

using the CM/ECF system which will send notification of such filing to the e-mail addresses

4

registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

5

6

       *s/Gregory F. Coleman*
       Gregory F. Coleman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28